IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CINDY ANNE O'CONNOR           )
                              )
v.                            )       No. 2:09-0082
                              )       Judge Wiseman/Bryant
SOCIAL SECURITY ADMINISTRATION )


To:     The Honorable Thomas A. Wiseman, Jr., Senior Judge


## REPORT AND RECOMMENDATION

        This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to

obtain judicial review of the final decision of the Social Security Administration ("SSA" or

"the Administration"), through its Commissioner, denying plaintiff's application for

disability insurance benefits ("DIB") and  supplemental security income ("SSI") benefits, as

provided under Titles II and XVI of the Social Security Act ("the Act").  The case is currently

pending on plaintiff's motion for judgment on the administrative record (Docket Entry No.

19), to which defendant has responded (Docket Entry No. 22).  Upon consideration of these

papers and the transcript of the administrative record (Docket Entry No. 15),[1] and for the

reasons given below, the undersigned recommends that plaintiff's motion for judgment be

GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for

further administrative proceedings consistent with this report, to include rehearing.

---

        [1]Referenced hereinafter by page number(s) following the abbreviation "Tr."

# I. Introduction

Plaintiff filed her SSI and DIB applications in July 2005 and August 2005, respectively, claiming that she had been unable to engage in substantial gainful activity since April 1, 2005.[2] (Tr. 106-09, 115) After initial and reconsideration denials on the record, plaintiff requested de novo hearing of her case by an Administrative Law Judge ("ALJ"). The ALJ hearing was held on April 15, 2008, when plaintiff appeared with counsel and gave testimony. Testimony was also received from an independent vocational expert. (Tr. 788-813) At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement until August 28, 2008, when he issued a written decision finding plaintiff to be not disabled. (Tr. 13-20) The ALJ's decision contains the following enumerated findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011.

2.   The claimant has not engaged in substantial gainful activity since April 1, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.   The claimant has the following severe combination of impairments: degenerative disc disease; chronic obstructive pulmonary disease; depression; poor vision; poor hearing; hypertension; and status post MI due to coronary artery disease (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526,

---

[2]While it appears that plaintiff's counsel filed a request to amend the alleged onset date to December 31, 2005 (Tr. 69), which amendment was recognized by the ALJ at the hearing (Tr. 791-92), it appears that plaintiff's work at McDonald's after April 1, 2005 was part-time, and not at the level of substantial gainful activity. (Tr. 15, 403) Despite plaintiff's attempt to amend the alleged onset date, the ALJ in his decision and the government in its brief state that the pertinent date remains April 1, 2005.

416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) with additional limitations: avoid temperature extremes and strong fumes and the claimant has moderate difficulties in maintaining concentration, persistence and pace.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on July 17, 1964 and was 40 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has a "limited" to high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 15, 16, 19, 20)

On June 10, 2009, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 2-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c). If the ALJ's findings are supported by substantial evidence,

3

based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record[3]

### A. Medical Evidence

Ms. O'Connor's past medical history includes cervical fusion surgery to repair a large disc herniation at C5-6. Additionally, she has been under the care of a cardiologist, Dr. Joel Tanedo, for vasospastic angina and hypertension. Ms. O'Connor was hospitalized five times between 2002 and 2005 for myocardial infarctions. (Tr. 423-36, 464, 613-28, 731-83). Hospitalizations were at Cookeville Regional Medical Center and White County Hospital. (Tr. 437-38, 625-28). She was hospitalized in April 2005 for a subendocardial acute myocardial infarction. While in the hospital she was diagnosed with new onset atrial fibrillation. She has had two cardiac catheterizations performed by Dr. Tanedo in 2004. (Tr. 462-63).

Ms. O'Connor's primary care physician, Dr. Alan Drake, ordered imaging tests in May 2005, due to complaints of chronic neck and back pain and numbness in her right arm and hand. (Tr. 659). A cervical MRI revealed a central HNP (herniated nucleus pulposus), non-compressive in nature, unchanged since December 14, 2002, at C4-5. There were degenerative changes with disc desiccation and a large central and leftward HNP that extends to the preforaminal region and abuts the cord with flattening resulting in moderate central canal stenosis and left foraminal encroachment at C5-6. At C6-7, the MRI showed right pre-foraminal HNP that resulted in moderate to severe right foraminal encroachment,

---

[3]The following record review is taken from plaintiff's brief. (Docket Entry No. 20 at 2-7)

4

unchanged.  A thoracic MRI showed degenerative changes throughout the mid and lower thoracic spine without mild disc desiccation and marginal osteophytes.  At T7-8, there was a central and rightward HNP that abutted the cord with mild flattening.  There were non-compressive mixed spondylitic protrusions at multiple thoracic levels.  (Tr. 690-91, 698).  Ms. O'Connor subsequently reported numbness in her right arm and hand on June 8, 2005.  (Tr. 648).  A second MRI was performed on June 8, 2005, at the request of Dr. Robert Davis.  The MRI showed the previous intervertebral fusion at C5-6, degenerative circumferential disc bulge at C6-7, a small area of possible gliosis at C5-6, and mild degenerative posterior osteophyte at C5-6.  (Tr. 479).  X-ray showed mild degenerative changes present at C6-7. (Tr. 480).

In July 2005, Dr. Drake gave Ms. O'Connor indefinite restrictions of no lifting over ten pounds and no excessive reaching over the head.  (Tr. 645).  In July 2005, she underwent physical therapy at White County Hospital for severe shoulder pain.  (Tr. 721-28).  In October 2005, Dr. Drake completed a food stamps form indicating that Ms. O'Connor was unable to comply with the work requirements due to disability.  Specifically, she had a history of four heart attacks, neck pain and back pain according to Dr. Drake.  He opined that she was unable to perform work of any kind.  (Tr. 341-42).

Dr. Timothy Fisher performed a consultative examination in November 2005. His examination showed dyspnea at rest.  Ms. O'Connor exhibited mild difficulty getting from the chair to the examination table.  Cervical flexion-extension was limited to 20 degrees, and there was decreased sensation of the left L4 and L5 dermatome to monofilament.  Breath sounds were slightly diminished with a prolonged expiratory phase. Pulmonary function testing showed moderate obstructive lung disease with low vital

capacity. The best post-bronchodilator results were an FEV1 at 1.79 and an FVC of 2.49.

Ms. O'Connor's height was 5'5". Dr. Fisher opined that Ms. O'Connor would have difficulty

doing any jobs that required any prolonged standing or ambulation. He stated that she might

be able to perform jobs that required sitting with gripping and manipulating objects from one

to five pounds occasionally. (Tr. 629-41).

Dr. William O'Brien performed a consultative psychological evaluation in

April 2006 and diagnosed Ms. O'Connor with a major depressive disorder, recurrent,

moderate. He opined that Ms. O'Connor was moderately impaired in her ability to sustain

concentration and persistence, remember moderate to complex instructions, or maintain

schedules and attendance. (Tr. 593-97).

Andrew J. Phay, Ph.D. completed a psychiatric review technique and a mental

residual functional capacity assessment on May 1, 2006. He found that Ms. O'Connor had a

mild restriction of activities of daily living and moderate difficulties in maintaining

concentration, persistence or pace. (Tr. 575-92).

White County Health Department and emergency room records from

November 2006 through January 2007 showed multiple visits for acute bronchitis and

chronic obstructive pulmonary disease with acute exacerbations. Ms. O'Connor was treated

with Prednisone and other medications. (Tr. 533-560, 563-574).

In February 2007, Ms. O'Connor began seeing Dr. Ahmad Rashid,

pulmonologist, on a referral from the health department. She reported shortness of breath

with activities of daily living. She had been on nocturnal oxygen for some time. Pulmonary

function testing showed moderate obstructive ventilator defect, small airway obstruction,

and lung volumes consistent with residual hyperinflation. Dr. Rashid diagnosed Gold stage

6

II chronic obstructive pulmonary disease with emphysema and evidence of significant hyper reactivity in airways. He continued her medications, which included Spiriva, Albuterol, and Q Var. He wanted to start her on Advair, but Ms. O'Connor could not afford it at that time. She was to continue using home oxygen. (Tr. 519-522, 527, 562).

In March 2007, Ms. O'Connor was treated at the health department for chronic back and neck pain and chronic obstructive pulmonary disease exacerbation with acute bronchitis. Dr. Rashid completed a medical assessment in April 2007, in which he indicated the presence of the following pulmonary symptoms: shortness of breath, chest tightness, wheezing, fatigue and coughing. He stated that Ms. O'Connor had moderately severe asthma attacks that could be precipitated by an upper respiratory infection, emotional upset/stress, or irritants. Her symptoms were frequently severe enough to interfere with attention and concentration. Dr. Rashid opined that Ms. O'Conner could stand or walk for less than two hours in a workday and could occasionally lift or carry ten pounds. She needed to avoid even moderate exposure to environmental irritants and was likely to be absent about twice a month due to her impairments. (Tr. 513-16).

In June 2007, Ms. O'Connor complained of chest pain with tightness on exertion. (Tr. 453). In September 2007, Dr. Rashid evaluated Ms. O'Connor for chronic obstructive pulmonary disease. He found she had Gold stage II chronic obstructive pulmonary disease and emphysema. (Tr. 451). On cardiovascular examination in January 2008, Dr. Rashid noted that Ms. O'Connor was without murmur, gallops or rubs. On respiratory examination, Dr. Rashid noted increased anteroposterior diameter of her chest but her lungs were clear to auscultation bilaterally. She had been started on an inhaler and using oxygen, but she had just recently quit smoking. He recommended that she enroll in

7

pulmonary rehabilitation once her insurance was straightened out. (Tr. 450).

On April 14, 2008, Ms. O'Connor underwent an ECG that was electrocardiographically and clinically negative for exercise induced ischemia at an adequate workload. Dr. Case opined that Ms. O'Connor had angina consistent with prinzmetal's angina. (Tr. 421-26)

B. <u>Hearing Testimony</u>

Ms. O'Connor testified that she had an eleventh grade education and completed her G.E.D. in 1990. Her only work was as a fast food worker. (Tr. 794). She had a cervical disc fusion in 1997. (Tr. 796). Since then she had developed back and neck problems. She has had difficulty turning her head. She experiences residual pains such as radiating right arm numbness, inability to lift her arm over her head, ten pound lifting restriction and pain around her rib area. (Tr. 297). She reported that if she moves continuously she experiences flare-ups in her neck and back. She averred that she would have to break for a couple of hours and then continue her activity. (Tr. 578). She testified she has problems breathing at work. (Tr. 798). She further testified that she gets severe cramps in her lower back going down into her hips. (Tr. 799). She testified that she has heart problems. She has had five heart attacks and her arteries have spasms that lead to heart attacks. She reported that spasms come on with both resting and exertion. She takes nitroglycerin to stop the spasms. (Tr. 800-01). She has breathing problems and uses an inhaler. She testified that excessive movement causes shortness of breath. She uses oxygen at night. She indicated that she has used oxygen for the past four years. (Tr. 802-04). She stated she had stopped smoking one time previously and experienced significant weight gain. (Tr. 804-05). She reported using Wellbutrin for depression. She testified that she was

8

unable to afford counseling after losing her insurance in 2006. She reported blurred vision as a side effect of her medications. (Tr. 805-06). Ms. O'Connor testified that she had decreased hearing. She noted this had gradually worsened over the past three years. (Tr. 809).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir. 1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

#### B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are

9

demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at §

423(d)(3).  In proceedings before the SSA, the claimant's case is considered under a five-step

sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
>
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
>
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations.  Claimants with lesser impairments proceed to step four.
>
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
>
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r

of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f),

416.920 (b)-(f).

   The SSA's burden at the fifth step of the evaluation process can be carried by

relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the

claimant is not significantly limited by a nonexertional impairment, and then only when the

claimant's characteristics identically match the characteristics of the applicable grid rule.  See

Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003).  Otherwise, the grids cannot be

used to direct a conclusion, but only as a guide to the disability determination.  Id.; see also

Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).  In such cases where the grids do not

direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony.  See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere.  See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

### C.  Plaintiff's Statement of Errors

Plaintiff argues that the ALJ erred in failing to find the criteria of Listing 1.04A met or equaled by the findings of record regarding plaintiff's cervical and thoracic spine impairment; in rejecting the opinions of all examining physicians; and, in finding plaintiff's complaints of disabling pain less than fully credible.  As explained below, the undersigned finds that the ALJ overlooked objective medical evidence which supports the assessment of the consultative physician and plaintiff's subjective complaints, requiring remand for consideration of this evidence and resolution of an apparent evidentiary conflict.

As to Listing 1.04A, the following medical criteria (or their equivalents) must be demonstrated to establish disability under the this section:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the

cauda equina) or the spinal cord.  With:

A.  Evidence of nerve root compression characterized by neuro-anatomic
distribution of pain, limitation of motion of the spine, motor loss (atrophy
with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss
and, if there is involvement of the lower back, positive straight-leg raising test (sitting and
supine)[.]

While the ALJ did not discuss this listing in arriving at his step three

determination of no listing-level impairment (Tr. 15-16), any error in failing to do so would

appear to be harmless, as it is clear from the medical record that the particulars of subsection

A are not demonstrated in this case.  Defendant concedes that plaintiff has a disorder of the

cervical spine.  However, the medical record contains no mention of any motor loss or reflex

loss, and only one mention of decreased sensation, which does not appear to correspond to

plaintiff's cervical spine impairment.  (Tr. 633)  In order to meet or medically equal a listing,

all the criteria of the listing must be established in the medical evidence, or fairly

represented by a comparable, documented finding of equal medical severity.  See Sullivan v.

Zebley, 493 U.S. 521, 531 (1990).  The criteria of Listing 1.04A  have not been so

demonstrated here.

However, there is a conflict in the objective medical proof of plaintiff's

cervical impairment which was not recognized by the ALJ, and which, if resolved in favor of

the unrecognized evidence, would tend to support plaintiff's case for disability.  As noted by

the ALJ, plaintiff had a fusion surgery on her fifth and sixth cervical vertebrae in 1997,

performed by Dr. Burkman, a neurosurgeon, which surgery was reported to be helpful but

12

not entirely successful in eliminating pain in the region. (Tr. 18)[4] In December 2002,

plaintiff reported to her internist, Dr. Drake, with significant neck and radicular pain and

reduced range of motion, and appropriate medication was prescribed. (Tr. 679) On

December 24, 2002, plaintiff had an MRI of her cervical spine which revealed a "nominal

noncompressive central HNP [(herniated nucleus pulposus)]" at the level of the fourth and

fifth cervical vertebrae; a "[l]arge central and leftward HNP that extend to the preforaminal

region resulting in marked left lateral cord flattening and moderate left foraminal

encroachment" at the C5-6 level; and, "a right preforaminal and foraminal HNP that results

in moderate/severe right foraminal encroachment." (Tr. 698) She was scheduled to return to

Dr. Burkman in January 2003. Id. The next pertinent report from Dr. Drake was that

plaintiff had seen Dr. Burkman, but that on April 9, 2003, she had suffered a new, acute neck

injury in addition to her chronic neck pain, which was accompanied by stiffness and reduced

range of motion. She was to continue seeing Dr. Burkman. (Tr. 675)

On May 2, 2005, plaintiff returned to Dr. Drake with complaints documented

in the following treatment note:

> Cindy is here with quite a bit of neck pain. Her h[istory] is positive for having
> a C5-6 diskectomy by Dr. [Burkman]. She has done okay up until rather
> recently. She has now developed very significant pain in her neck radiating
> between her shoulder blades with burning and numbness out into her R hand
> and she is hurting quite a bit. She also has an area on the lower mid to lower
> thoracic area that has now developed pretty intense pain. ...

(Tr. 650) Dr. Drake noted reduced range of motion in the neck secondary to pain, prescribed

Vicodin in conjunction with muscle relaxers, and ordered an MRI of the cervical and

---

[4]The record does not appear to contain any records or treatment notes from Dr. Burkman.

thoracic spine.  Id.  The MRI was performed the next day, May 3, 2005, and the cervical

results were compared to the previous MRI results from 2002, yielding essentially unchanged

findings of "a central HNP, noncompressive in nature" at C4-5; "degenerative changes with

disc desiccation and a large central and leftward HNP that extends to the preforaminal

region and abuts the cord with flattening resulting in moderate central canal stenosis and left

foraminal encroachment" at C5-6; and, "right preforaminal HNP that results in

moderate/severe right foraminal encroachment" at C6-7.  (Tr. 691)  A thoracic spine MRI

performed the same day revealed "a central and rightward HNP that abuts the cord with

mild flattening" but "[n]o substantive central canal or foraminal encroachment;"

noncompressive mixed spondylitic protrusions were also visualized at multiple levels of the

thoracic spine.  (Tr. 690)  Plaintiff was referred to a different neurosurgeon, Dr. Davis, but

could not get an appointment until late in the month of May 2005.  (Tr. 649-50)  In the

meantime, plaintiff reported to Dr. Drake with complaints of pain and radicular symptoms,

and requested that she be referred to physical therapy until she could see Dr. Davis.  (Tr.

648-49)  However, Dr. Drake declined to give this referral, as he wanted her to see the

neurosurgeon first.  (Tr. 649)

       Plaintiff  was apparently seen in Dr. Davis' office as scheduled at the end of

May 2005, but by Dr. Davis' assistant rather than the doctor himself.  (Tr. 646)  Plaintiff

subsequently related to Dr. Drake that the assistant stated that she should have had MRIs

done with contrast, rather than without, and proceeded to order new radiographs.  Id.

Contrary to what had been revealed in the previous MRIs, the contrasted cervical MRI,

performed on June 8, 2005, essentially revealed degenerative changes of the cervical spine,

but no evidence of stenosis or neural foraminal narrowing. (Tr. 479) Nonetheless, plaintiff was back in Dr. Drake's office on June 27, 2005, complaining of severe, persistent neck and back pain. Plaintiff reported that she was still waiting to see Dr. Davis. She requested that Dr. Drake administer a painkilling injection, and asked whether she could wear her cervical collar around the clock, instead of just at night. (Tr. 646) She had been continuing to work part time at McDonald's, and requested that Dr. Davis excuse her from such work for a couple of days to rest her neck. Dr. Drake noted on exam that plaintiff was "quite tender and sensitive to touch," and he prescribed a month's supply of Vicodin. Id.

On June 30, 2005, plaintiff was back in Dr. Drake's office after finally having seen Dr. Davis. The following treatment note was made of that visit:

> She is here basically because her neck is cont'ing to kill her. She states that she is taking a lot of pain medication. The pain is so intense, she has lost a lot of weight. She states she has lost 20 pounds since April. She states the neurosurgeon basically told her that there was nothing wrong with her; however, I am surprised at that looking at her MRI. ... At this point, I am going to put her into PT and her 1st appt is on 7/5 at 2:30 and the doctor had mentioned some kind of shots in her back. ...

(Tr. 646) Plaintiff did not respond well to the physical therapy ordered by Dr. Drake. On July 6, 2005, plaintiff reported pain from her therapeutic exercises, and Dr. Drake administered an injection of Demerol. (Tr. 645) On July 8, 2005, Dr. Drake noted as follows: "Cynthia reports that PT told her that they couldn't help her and recommended she see another neurosurgeon. I have advised her this will not do any good because she has already been advised that there is no neurosurgical help for this problem." Id. Dr. Drake subsequently assigned indefinite work restrictions of lifting no more than 10 pounds and no

15

excessive reaching over her head, based on her "chronic neck pain with multiple HNP's." Id. It was also revealed that plaintiff had lost her Medicaid and her TennCare. (Tr. 644-45)

It is clear from this history that plaintiff's previous experience with spinal impairments and the surgery they necessitated was exacerbated in the spring of 2005, and her allegation of disabling pain beginning April 1, 2005 (Tr. 319-20), as well as Dr. Drake's prescription of the narcotic Vicodin beginning April 2, 2005 (Tr. 650) is consistent with that. However, none of the foregoing evidence was discussed by the ALJ. Rather, the only portion of the ALJ's decision dealing with plaintiff's history of spinal impairment is the following paragraph:

> The claimant has a history of degenerative disc disease. She has had a C-spine diskectomy and fusion of C5-6 performed by Dr. Burkman [in 1997] which she states was helpful but still has some pain, but no radiating pain. An MRI of the cervical spine dated June 8, 2005, revealed no evidence of stenosis and no neural foraminal narrowing.

(Tr. 18) For his part, Dr. Drake opined for purposes of plaintiff's application for food stamps that plaintiff was totally disabled because of her heart problems and chronic neck and back pain, albeit in conclusory fashion, without specific assessment of plaintiff's work-related capabilities. (Tr. 341-42) However, Dr. Timony Fisher, the consultative examiner, found that plaintiff had pain-limited range of motion in her neck (Tr. 632), and opined that due to her multiple medical problems, plaintiff would have difficulty with prolonged standing or walking, but that she might be able to perform work involving sitting and not more than occasional gripping and manipulating of objects weighing more than five pounds. (Tr. 634) The ALJ rejected Dr. Fisher's opinion, citing its inconsistency with the record as a whole.

16

(Tr. 16)  However, the manipulative restrictions Dr. Fisher assigned appear to have been based on plaintiff's cervical and mid-thoracic spine impairments, though Dr. Fisher only had his own examination of that region and, apparently, the May 2005 thoracic spine MRI to inform his opinion.  (Tr. 630)  Plaintiff also testified that it was the continuous moving of her arms and the "quick work" she did during her two-hour work shifts at McDonald's which caused her neck and upper back pain to flare.  (Tr. 798)  It also appears that plaintiff has radicular symptoms of numbness, if not pain, in the hands (Tr. 648-50)  She further testified that she needed help with most of her daily chores, and that she lies down for two or three hours per day (Tr. 806-07).

While the ALJ relied on "the aggregate of the medical evidence" and the proof of plaintiff's daily activities to find her medically stable and capable of performing a range of sedentary work (Tr. 18-19), he did so by implicitly rejecting a line of medical evidence which contains multiple significant objective medical findings and corresponding prescriptions for treatment of severe pain.  Although apparently not listing-level, plaintiff's spinal impairments are defined by a record that deserved more discussion than what was given by the ALJ.  In particular, without more complete treatment of this evidence it cannot be said that the ALJ's weighting of the examining source opinions and his rejection of plaintiff's complaints of disabling pain are supported by substantial evidence.  See, e.g., Daniels v. Comm'r of Soc. Sec., 70 Fed. Appx. 868, 871 (6th Cir. July 30, 2003) (determination of whether substantial evidence exists must be based on record as a whole, considering "whatever in the record fairly detracts from its weight") (quoting Crouch v. Sec'y of Health & Human Servs., 909 F.2d 852, 855 (6th Cir. 1990)).  Accordingly, the undersigned would

17

recommend reversal of the agency's decision and remand for further administrative proceedings, to include rehearing, and explicit attention to the evidentiary conflict between the June 2005 cervical MRI report which identified only noncompressive degenerative processes, and the other, preceding cervical MRI reports and treatment notes which speak of more significant pathology.[5]

## IV.  Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be GRANTED, and that the decision of the SSA be REVERSED and the cause REMANDED for further administrative proceedings consistent with this report, to include rehearing.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

---

[5]In addition, while not raised by plaintiff, it appears that the ALJ included in his RFC finding moderate difficulties in maintaining concentration, persistence and pace (Tr. 16), but did not include such limitations in his hypothetical to the vocational expert.  (Tr. 811)

**ENTERED** this 2nd day of September, 2010.

                                   s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE

19